1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
9                             AT TACOMA

10

11    CAN-AM FUEL DISTRIBUTION LLC,          CASE NO. 3:24-cv-05743-DGE

                         Plaintiff,           ORDER GRANTING IN PART
12                                            AND DENYING IN PART
          v.                                  DEFENDANTS' MOTIONS TO
13    SINCLAIR OIL LLC et al.,                DISMISS (DKT. NOS. 14, 17)

14                       Defendants.

15

16        Defendants Sinclair Oil LLC ("Sinclair") and Glovis America Inc. ("Glovis") each filed a

17   motion to dismiss for failure to state a claim.  (*See* Dkt. Nos. 14, 17.)  For the reasons stated

18   herein, each motion is GRANTED IN PART and DENIED IN PART.

19             **I.        FACTUAL AND PROCEDURAL BACKGROUND**

20        For purposes of the present motions, the Court accepts as true the facts alleged in the

21   Complaint and the documents attached therewith.[1]

22

23   _____
     [1] The Court also relies on various documents attached to the complaint and referenced in the
24   complaint. "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers

Plaintiff Can-Am Fuel Distribution LLC ("Can-Am") owns and operates a motor fuel station at 16320 SE Cascade Park Drive, Vancouver, Washington.  (Dkt. No. 1 at 1, 5.)  Can-Am also operates a convenience store at this location using Sinclair's DINO MART® Trademark. (*Id*. at 2.)

Defendant Sinclair is a refiner of Sinclair-branded motor fuel and owner of certain trademarks.  (*Id*. at 5.)  Defendant Glovis is a third-party logistics provider that provides transportation and logistics services on behalf of motor vehicle original equipment manufacturers and parts suppliers, as well as manufacturers of industrial products and consumer goods.  (*Id*. at 16.)  A small percentage of Glovis's logistics business included the distribution of motor fuel. (*Id*. at 3.)

**A.  The Contracts**

1.  <u>Sinclair Trademark License Agreement</u>

Sinclair and Glovis executed a Sinclair Trademark License Agreement ("STLA") on March 31, 2015.  (Dkt. No. 1-1 at 15.)  The STLA designated Glovis as a "Distributor-Licensee" and granted Glovis a "non-exclusive, non-assignable license to use . . . at Licensed Locations" the "Sinclair Trademarks."  (*Id*.)  Licensed Locations were identified as retail gas stations where the Sinclair Trademarks where authorized for use.  (*Id*.)  The STLA also authorized Glovis to sublicense the Sinclair Trademarks to "Distributor Licensee's Dealers" so long as 1) the Dealer executes a "Sinclair Trademark Agreement in form and substance specified by Sinclair"; 2) a copy of the fully executed Sinclair Trademark Agreement is delivered to Sinclair; and 3) Sinclair

---

evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *Id*. at 908.

1    provides written approval of the Dealer's use of the Sinclair Trademarks at a specific Licensed

2    Location. (*Id.* at 16.) Sinclair maintained "the right to prohibit the use of Sinclair Trademarks to

3    any Dealer for any reason." (*Id.*) Sinclair also required Glovis and its Dealers to use "Sinclair

4    trademarked signs, service symbols, logos, and trademarked merchandise purchased from an

5    approved Sinclair vendor." (*Id.* at 17.)

6        For each Licensed Location, including a Dealer's Licensed Location, Glovis was required

7    to pay Sinclair a monthly license fee pursuant to a Licensed Location Fee Agreement. (*Id.*; *see*

8    *also id.* at 27–28.) The License Location Fee Agreement required each Dealer seeking to use the

9    Sinclair Trademarks at a Dealer's Licensed Location to agree to be bound by all provisions of

10   Glovis's STLA and to obtain Sinclair's written approval before using the Sinclair Trademarks.

11   (*Id.* at 27.)

12       Among other things, the STLA further authorized and required Glovis and each of its

13   Dealers to accept Sinclair credit cards. (*Id.* at 18–20.) The STLA contained specific terms about

14   procedures for accepting Sinclair credit cards and how credit card payments and deposits would

15   be processed and delivered to Glovis. (*Id.*) Sinclair reserved the right to terminate Glovis's and

16   its Dealers' authorization to accept Sinclair credit cards upon seven days advance written notice.

17   (*Id.* at 5.)

18       The execution of the STLA was "for the sole and express purpose of branding gasoline

19   stations in markets that do not currently have access to supply by Sinclair of petroleum

20   products." (*Id.* at 16.) The STLA further recognized that Sinclair did "not currently supply

21   [Glovis's] geographic marketing region with physical petroleum product, either gasoline or

22   diesel supply, nor [did] Sinclair have or maintain an exchange agreement at any terminal inside

23   such region." (*Id.*) But if Sinclair were to begin offering petroleum products in Glovis's

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS (DKT.
NOS. 14, 17) - 3

marketing region, the parties would engage in good faith negotiations to "begin a supply contract which would supersede and replace" the STLA. (*Id*.)  To be clear, the STLA does not identify that Sinclair would supply petroleum products to Glovis for sale or distribution.

2. Sinclair Trademark Sublicense Agreement

In April 2019, Can-Am's affiliate and predecessor, Torcroft, LLC, executed a Letter of Intent with Glovis and Sinclair whereby Torcroft committed to branding the site located at 16320 SE Cascade Park Drive, Vancouver, Washington as a Sinclair site. (*Id*. at 76.)  Sinclair was actively involved in reviewing and approving the plans for this site to be a Sinclair site. (Dkt. 1 at 6–7; Dkt. 1-1 at 78–80.)

On November 22, 2019, Glovis and Can-Am executed a Sinclair Trademark Sublicense Agreement ("STSA") for use of the Sinclair Trademarks at Licensed Locations. (Dkt. No. 1-1 at 2.)  Each Licensed Location had to be specified in a separate Licensed Location Fee Agreement "entered into by Sinclair and [Glovis.]" (*Id*. at 3.)  Sinclair and Glovis executed a "Licensed Location Fee Agreement: 10 year Contract" for Can-Am's retail location located at 16320 SE Cascade Park, Vancouver, Washington on December 5, 2019—the same site that was subject of the Letter of Intent signed by Can-Am's predecessor, Glovis, and Sinclair. (*Id*. at 97–98.)  This Licensed Location Agreement required Can-Am (as a Dealer) to agree in writing to be bound by all provision of "the Trademark License Agreement relating to the use of the Sinclair Trademarks." (*Id*. at 97.)  Pursuant to the STSA, Can-Am was required to pay the monthly $500 license fee *directly* to Sinclair for this Licensed Location on or before the 10th date of each month, and any untimely payments were subject to 18% interest. (*Id*. at 4.)

Also, Can-Am's use of Sinclair Trademarks was contingent on Can-Am executing a "Sinclair Trademark Agreement in the form and substance specified by Sinclair or Glovis"; on a

copy of the executed Sinclair Trademark Agreement being delivered to Sinclair; and on Sinclair or Glovis providing written approval of Sinclair Trademarks at a specific Licensed Location. (*Id*.)

The STSA also contains almost verbatim the terms and requirements regarding the acceptance and processing of Sinclair credit cards. (*Compare* Dkt. 1-1 at 6–7 and at 18–20.) Except under the STSA, Sinclair would engage Can-Am directly in processing credit card payments, distributing credit card deposits, and serving all notices. (*Id*.)

In addition, Sinclair was granted specific "rights and remedies [identified in the STSA] upon any . . . misrepresentation, breach or default [of the STSA] as Sinclair elects[.]" (*Id*. at 8–9.)

Similar to the STLA, the STSA identified that it was entered into for the "sole and express purpose of branding gasoline stations in markets that do not currently have access to supply by Sinclair of petroleum products." (*Id*. at 3.) And with the exception of "the west side pumps at the Vancouver station operated by an affiliate of" Can-Am, Can-Am was required to purchase solely through Glovis "all branded fuels meeting Top Tier standards." (*Id*.) As with the STLA, the STSA identifies that Sinclair does not supply petroleum products and that if Sinclair began offering petroleum products within Can-Am's marketing region, Can-Am agreed to engage in good faith negotiations with Sinclair "to begin a supply contract which would supersede and replace" the STSA. (*Id*.) To be clear, the STSA does not identify that Sinclair would supply petroleum products to Can-Am for sale or distribution; nor does the complaint

1    contain any factual allegation indicating Sinclair supplied petroleum products to Can-Am (or

2    Glovis).[2]

3    **B. Facts offered in support of Can-Am's claims**

4    Can-Am asserts the STLA together with the STSA established a franchise under the

5    Petroleum Marketing Practices Act ("PMPA"). (Dkt. 1 at 12.) Can-Am asserts both Sinclair and

6    Glovis are each a PMPA franchisor because they are either a "refiner" or "distributor" that

7    permitted the use of a trademark in connection with the sale or distribution of motor fuel. (*Id*. at

8    13.) To support these claims, Can-Am cites language from the STLA and the STSA which

9    convey and impose on Sinclair and Glovis enforceable rights and responsibilities with respect to

10   Can-Am's use of the Sinclair Trademarks. (*Id*. at 6–12.)

11   Can-Am also identifies it was authorized to use the Sinclair Trademarks at 16320 SE

12   Cascade Park, Vancouver, Washington, otherwise known as Can-Am's Licensed Location. (*Id*.

13   at 13; *see also* Dkt. No. 1-1 at 97.) It further alleges the Licensed Location was authorized to

14   operate a Dino Mart convenience store using Sinclair's DINO MART® Trademark and that use

15   of the DINO MART® Trademark under the STSA constituted a franchise under Washington's

16   Franchise Investment Protection Act ("FIPA"). (*Id*. at 13-14.) Can-Am identifies Sinclair never

17   delivered franchise disclosure documents related to the DINO MART® Trademark. (*Id*. at 14.)

18   Can-Am also identifies neither Sinclair nor Glovis registered the DINO MART® Trademark as

19   required by FIPA. (*Id*.)

20

21

22   ───────────────

23   [2] Can-Am asserts, "Pursuant to the Sinclair Trademark License, GLOVIS is . . . a distributor of motor fuel supplied by Sinclair or authorized by Sinclair to be identified with the Sinclair Trademarks." (Dkt. No. 1 at 5.) But nothing in the STLA indicates Sinclair supplied motor fuel to Glovis.

24

1    According to Can-Am, in 2022 Sinclair engaged in business transactions that resulted in

2    Sinclair, through an affiliated entity, supplying petroleum products in Can-Am's geographic

3    marketing region.  (*Id*. at 16.)  Because of this, "[b]y July 2023, Sinclair was . . . part of . . . an

4    organization that had no desire to continue the distribution model reflected in the" STLA and the

5    STSA.  (*Id*. at 16.)  Instead, Sinclair became interested in selling motor fuel in the Pacific

6    Northwest.  (*Id*.)  Also, by July 2023, Glovis announced it was "exiting the fuel distribution

7    business altogether."  (*Id*.)

8    Can-Am asserts Sinclair and Glovis acted together to terminate Can-Am's use of the

9    Sinclair Trademarks under the STSA.  (*Id*. at 17.)  Sinclair had knowledge and otherwise

10   approved of Glovis's unilateral attempts, without Can-Am's permission, to assign the STSA to

11   another distributor.  (*Id*.)  These efforts included cutting off the supply of motor fuel and

12   withholding funds owed to Can-Am.  (*Id*.)  Importantly, Sinclair prevented Can-Am from

13   processing Sinclair authorized credit cards.  (*Id.* at 18–24.)

14   Since July 2023, the parties have disputed their respective rights and responsibilities

15   under the STLA and the STSA.  On September 3, 2024, Can-Am filed its complaint.  Can-Am

16   asserts claims against Sinclair and Glovis for violation of both federal and state statutes,

17   including the PMPA, the Washington Consumer Protection Act ("CPA") for violation of the

18   FIPA, and Washington's Gasoline Dealer Bill of Rights ("GDBRA").  (*Id.* at 30–35.)  Cam-Am

19   also asserts claims against Sinclair and Glovis for breach of contract and breach of the implied

20   duty of good faith and fair dealing.  (*Id.* at 35–37.)  Finally, Can-Am asserts, in the alternative,

21   claims against Sinclair for inducing breach of contract, intentional interference with contractual

22   relations, and intentional interference with prospective economic advantage.  (*Id.* at 37–40.)

23

24

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) motions to dismiss may be based on either the "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

Thus, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a motion to dismiss, the Court takes a two-step approach: First, the Court separates factual allegations, which must be presumed true, from legal conclusions, which are not presumed true. *Id.* at 678–679. Second, the Court determines if those facts "plausibly give rise to an entitlement to relief." *Id.* at 679.

## III.    DISCUSSION

### A.  Sinclair's Motion to Dismiss (Dkt. No. 14)

In its motion to dismiss, Sinclair argues Can-Am is improperly attempting to pull Sinclair into a dispute between Can-Am and Glovis. (Dkt. No. 14 at 9.) Sinclair contends Can-Am's contract is with Glovis, and that Can-Am's statutory and contractual claims against Sinclair are

contingent on a contractual relationship between Sinclair and Can-Am that does not exist.  (*Id.*)

Sinclair argue Can-Am's tort claims against Sinclair fail because the alleged wrong by Sinclair

was contractually authorized in Sinclair's contract with Glovis.  (*Id.*)

    1.  <u>Can-Am has alleged the existence of some type of contractual relationship with Sinclair</u>

As a preliminary matter, Can-Am alleges facts sufficient to establish the existence of

some type of contractual relationship between Can-Am and Sinclair as to the Sinclair

Trademarks.  Can-Am plausibly alleges that Sinclair is the owner of the Sinclair Trademarks.

Sinclair signed the Letter of Intent acknowledging the intended use of the Sinclair Trademarks at

the site that became Can-Am's Licensed Location.  The STLA and STSA establish that Sinclair

approved Glovis's contractual relationship with Can-Am as to the use of the Sinclair

Trademarks.  Per the STLA and the STSA, Sinclair reviewed and had to approve Can-Am's use

of the Sinclair Trademarks.  Sinclair reviewed and had to approve the form of the STSA between

Glovis and Can-Am.  In reviewing and approving the form of the STSA, Sinclair agreed Can-

Am would pay Sinclair directly the $500 Licensed Location fee—which was the total Licensed

Location Fee Sinclair charged—for use of the Sinclair Trademarks at Can-Am's License

Location.  In approving the form of the STSA, Sinclair agreed it would participate in direct

transactions with Can-Am for the honoring and processing of Sinclair brand credit cards at Can-

Am's Licensed Location.  In approving the form of the STSA, Sinclair agreed it was reserving

for itself rights against Can-Am regarding use of the Sinclair Trademarks.  In approving the form

of the STSA, Sinclair and Can-Am agreed Can-Am had to meet Sinclair's "minimum

expectations" in using the Sinclair Trademarks and that Can-Am had to participate in Sinclair's

Secret Shopper Program.  Accordingly, enough plausible facts, if proven as true, have been

alleged to support the existence of some type of contractual relationship between Can-Am and

Sinclair as to the Sinclair Trademarks based on the rights and obligations outlined in the STSA and the License Location Fee Agreement.  The extent of the alleged contractual relationship between Can-Am and Sinclair will be for the ultimate trier of fact to determine.

2. PMPA claim

The PMPA "sets forth various grounds and accompanying notice requirements for termination and non-renewal [of a franchise agreement], and prohibits the termination of a franchise on grounds other than those expressly specified in the legislation." *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir. 1986).

The PMPA defines a "franchise" as "any contract: (i) between a refiner and a distributor, (ii) between a refiner and a retailer, (iii) between a distributor and another distributor, or (iv) between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use."  15 U.S.C. § 2801(1)(A).  A franchise includes "any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner[.]"  15 U.S.C. § 2801(1)(B)(ii)(I).

The existence of a direct contractual relationship between the parties is necessary for a franchise to exist under the PMPA.  *See Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1144 (11th Cir. 1988) ("It is clear that under the PMPA a franchise is viewed as a direct contractual relationship."[3]); *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920, 927 (9th Cir. 1993)

---

[3] Nonetheless, *Hutchens* acknowledges retailers may have an action under the PMPA against refiners with whom they have no contract "if the relationship between the refiner and its

1  ("A franchise is a contract."); *Estate of Handy v. R.L. Vallee, Inc.*, 993 F. Supp. 236, 240 (D. Vt.

2  1998) ("Under the PMPA, a franchise must involve a direct contractual relationship between

3  parties."); *Denise Petroleum, Inc. v. Ocean Petroleum, Inc.*, 32 F. Supp. 2d 534, 537 (E.D.N.Y.

4  1999) (The "plain meaning of the PMPA requires the existence of a contract in order for a

5  franchise to exist.");  *Brown v. American Petrofina Mktg., Inc.*, 555 F. Supp. 1327, 1332 (M.D.

6  Fla. 1983) ("In order for a franchise to exist, there must be a contract—either written or oral—

7  between the parties which pertains to the sale or distribution of motor fuel.").

8      Sinclair's motion does not challenge whether Sinclair is a "refiner" under the PMPA.[4]

9  Instead, Sinclair argues that because "there is no [PMPA] contract between [Can-Am], on the

10  one hand, and Sinclair, on the other", Can-Am fails to state a PMPA claim against Sinclair.

11  (Dkt. No. 14 at 15.)

12      While the Court has concluded Can-Am has plausibly asserted some type of contractual

13  relationship between Can-Am and Sinclair as to the Sinclair Trademarks, that relationship is not

14  a contract for purposes of the PMPA.  This is because the PMPA requires a contract "between a

15  refiner and a retailer . . . under which a refiner . . . authorizes or permits a retailer . . . to use, in

16  connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned

17  or controlled by such refiner."  15 U.S.C. § 2801(1)(A)(ii).  In applying this language, the

18  question is whether the phrase "in connection with the sale, consignment, or distribution of

19  motor fuel" means (1) "in connection with [the refiner's (Sinclair)] sale, consignment, or

20

21  ———————————————
    distributor is less than arm's length."  838 F.2d at 1145 (11th Cir. 1988), citing *Abadjian v. Gulf*
22  *Oil Corp.*, 602 F. Supp. 874, 881 (C.D. Cal. 1984); *Bsales v. Texaco, Inc.*, 516 F. Supp. 655,
    661–662 (D.N.J. 1981).

23  [4] Note that the Complaint makes only a conclusory statement that "Sinclair is a refiner[.]" (Dkt.
    No. 1 at 5.)  But it does not assert any facts identifying where or how Sinclair engages in refinery
24  operations.

distribution of motor fuel" or (2) "in connection with [the retailer's (Can-Am)] sale,

consignment, or distribution of motor fuel."  If the former, there can be no PMPA claim because

the Complaint fails to identify facts suggesting that Sinclair sold, consigned, or distributed motor

fuel to Can-Am, either directly or through Glovis.

The answer to this question is found in the PMPA's legislative history, which identifies

that Congress sought to regulate integrated oil companies' practices that affected the supply of

gasoline to retailers:

> '[t]he petroleum industry can be divided into four separate parts which are most
> commonly identified as production, transportation, refining, and 'marketing.  It
> described how the large oil companies' integration of these four parts gave them
> special power at the retail level: "Because of their integrated structure and the fact
> that they have traditionally realized most of their profits from production of crude
> oil, the large integrated refiners had already realized the profits they made on
> gasoline before it reached the marketing sector.' Congress also identified how the
> integrated oil companies' practices had begun to affect retailers like the Plaintiffs:

> [B]y closing their low volume and marginally profitable stations, refiners have
> substantially reduced the total number of gasoline outlets in this country....  [T]he
> forward integration of the large refiners not only provides the non-branded
> marketer with increased competition, but, more importantly, raises the possibility
> that the independent retailer will soon no longer be able to obtain gasoline from
> his traditional supplier.

*Merlino v. Getty Petroleum Corp.*, 716 F. Supp. 773, 776 (S.D.N.Y 1989) (cleaned up) (citing

*Problems of Small Retail Petroleum Marketers,* H.Rep. No. 94–1762, 94th Cong., 2d Sess.,

(1976)), *aff'd Merlino v. Getty Petroleum Corp,*, 916 F.2d 52, 54 (2nd Cir. 1990) ("[T]he PMPA

was designed to regulate the marketing practices of large, vertically integrated oil companies.").

Thus, the PMPA sought to prevent refiners' integrated practices from cutting off gasoline supply

to retailers.

Moreover, it is well recognized that "[t]he usual structure of a franchise relationship for

the sale of motor fuel consists of a refiner who contracts with a distributor to provide the

distributor with motor fuel, which the distributor in turn sells to a retailer for sale to the general public.  And pursuant to this structure, the retailer typically licenses from the refiner, or sublicenses from the distributor, the trademark that is owned or controlled by the refiner, in order to sell branded fuel to the public." *BP W. Coast Prod. LLC v. Crossroad Petroleum, Inc.*, No. 12CV665 JLS (KSC), 2012 WL 13124729, at *4 (S.D. Cal. Apr. 19, 2012).

Based on the PMPA's legislative history and the usual structure of a franchise relationship for the sale of motor fuel, the Court concludes the phrase "in connection with the sale, consignment, or distribution of motor fuel" relates to the refiner's role in a PMPA contract between a refiner and retailer.  This means the contract between a refiner (Sinclair) and a retailer (Can-Am) must be in connection with the refiner's sale, consignment or distribution of motor fuel to fall under the PMPA.  Because the Complaint does not claim Sinclair's alleged contractual relationship with Can-Am was "in connection with [Sinclair's] sale, consignment, or distribution of motor fuel," the alleged contractual relationship between Sinclair and Can-Am is insufficient to support a claim under the PMPA.

Accordingly, Sinclair's motion to dismiss Can-Am's PMPA claim is GRANTED.

3.  CPA/FIPA claim

FIPA defines a "franchise" as:

(a) An agreement, express or implied, oral or written, by which:

    (i) A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate;

    (ii) The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by the grantor or its affiliate; and

(iii) The person pays, agrees to pay, or is required to pay, directly or
indirectly, a franchise fee.

Wash. Rev. Code § 19.100.010(6).  A "'franchise fee' means any fee or charge that a franchisee

or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to

continue a business under the franchise agreement[.]"  Wash. Rev. Code § 19.100.010(8).  The

term "marketing plan" means:

> a plan or system concerning an aspect of conducting business.  A marketing plan
> may include one or more of the following:
>
> (a) Price specifications, special pricing systems or discount plans;
> (b) Sales or display equipment or merchandising devices;
> (c) Sales techniques;
> (d) Promotional or advertising materials or cooperative advertising;
> (e) Training regarding the promotion, operation, or management of the
>     business; or
> (f) Operational, managerial, technical, or financial guidelines or assistance.

Wash. Rev. Code § 19.100.010(11).

The complaint alleges the DINO MART® Trademark is one of the Sinclair Trademarks

included within the STSA and authorized to be used at Can-Am's Licensed Location.  (Dkt. No.

1 at 13.)  The complaint further alleges the DINO MART® Trademark relates to "Retail store

services featuring convenience store items and gasoline."  (*Id*.)  Sinclair acknowledges the DINO

MART® Trademark "is a trademark owned and licensed by Sinclair" and does not challenge that

Can-Am was authorized to use the DINO MART® Trademark at Can-Am's Licensed Location.

(Dkt. No. 14 at 16–17.)  Instead, Sinclair asserts the DINO MART® Trademark is not the

subject of any separate franchise agreement and therefore cannot alone support a FIPA claim.

(*Id*. at 17.)  But because Sinclair acknowledges the DINO MART® Trademark is a Sinclair

Trademark and does not dispute it is part of the Sinclair Trademarks authorized by the STSA,

Can-Am plausibly alleges the Licensed Location was authorized to use the DINO MART®

1  Trademark at the Licensed Location—which not only sells fuel but apparently also operates a

2  convenience store.

3  Sinclair also argues, "the PMPA would preempt any FIPA claim because it is integrated

4  with a motor fuel contract." (*Id*. at 17–18.) But because the Court has concluded Can-Am's

5  contractual relationship with Sinclair is not covered by the PMPA (because Sinclair was not

6  supplying petroleum products to Can-Am), the PMPA is irrelevant to Can-Am's alleged FIPA

7  claim.

8  Applying the definition of a franchise under FIPA, Can-Am has plausibly alleged a FIPA

9  claim at this stage of the litigation. Here, Sinclair reviewed and approved the terms of the STSA.

10  In doing so, among other things, Sinclair agreed to accept payment of the Licensed Location fee

11  directly from Can-Am. Sinclair agreed Can-Am would be subject to Sinclair's Secret shopper

12  Program. Sinclair agreed Can-Am could only purchase and obtain Sinclair Trademark signs and

13  logos from an approved Sinclair vendor. These facts support the conclusion that Can-Am has

14  plausibly alleged the existence of an "agreement, expressed or implied, oral or written" between

15  Sinclair and Can-Am regarding use of the Sinclair Trademarks (which would include use of the

16  DINO MART® Trademark).

17  Can-Am also has identified facts plausibly alleging that Sinclair "granted [Can-Am] the

18  right to engage in the business of offering, selling, or distributing goods or services under a

19  marketing plan prescribed or suggested in substantial part by the grantor or its affiliate." This is

20  because Can-Am identifies it had the right to use the Sinclair Trademarks at Can-Am's Licensed

21  Location to sell fuel. And with respect to a marketing plan, Sinclair's Brand Excellence

22  Guideline and Sinclair's Secret Shopper Program (which Can-Am was required to participate in)

23  raise questions as to the existence of a "plan or system concerning an aspect of conducting

24

business." Can-Am's Licensed Location was substantially associated with the Sinclair Trademarks as the purpose of obtaining a Licensed Location was to sell Sinclair branded fuel. And finally, as already noted, Can-Am paid a Licensed Location fee directly to Sinclair, which Sinclair authorized and accepted.

In sum, Can-Am at this stage of the litigation has plausibly alleged facts that the ultimate trier of fact may determine support the existence of a FIPA franchise.

Sinclair's motion to dismiss Can-Am's FIPA claim is DENIED.

4. GDBRA claim

The GDBRA governs motor fuel franchises. A "motor fuel franchise" is "an oral or written contract, either expressed or implied, between a motor fuel refiner-supplier and motor fuel retailer under which the motor fuel retailer is supplied motor fuel for resale to the public under a trademark owned or controlled by the motor fuel refiner-supplier or for sale on commission or for a fee to the public[.]" Wash. Rev. Code § 19.120.010(5).[5] A "motor fuel refiner-supplier" is "any person, firm, or corporation, including any affiliate of the person, firm, or corporation, engaged in refining of crude oil into petroleum who supplies motor fuel for sale, consignment, or distribution through retail outlets." Wash. Rev. Code § 19.120.010(6). An "affiliate" is "any person, firm, or corporation who controls or is controlled by any motor fuel refiner-supplier, and includes any subsidiary or affiliated corporation in which the motor fuel refiner-supplier or its shareholders, officers, agents, or employees hold or control more than

---

[5] The definition of a motor fuel franchise also includes "any agreements or any agreements between a motor fuel refiner-supplier and motor fuel retailer under which the retailer is permitted to occupy premises owned, leased, or controlled by the refiner-supplier for the purpose of engaging in the retail sale of motor fuel under a trademark owned or controlled by the motor fuel refiner-supplier supplied by the motor fuel refiner-supplier." *Id*. However, there is no allegation Can-Am is occupying premises owned, leased, or controlled by a refiner-supplier.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS (DKT. NOS. 14, 17) - 16

twenty-five percent of the voting shares." Wash. Rev. Code § 19.120.010(2).  A "motor fuel retailer" is "a person, firm, or corporation that resells motor fuel entirely at one or more retail motor fuel outlets pursuant to a motor fuel franchise entered into with a refiner-supplier." Wash. Rev. Code § 19.120.010(7).

Sinclair argues it is not a motor fuel refiner-supplier under the GDBRA and that there is no motor fuel franchise because "Glovis—not Sinclair—supplied motor fuel to" Can-Am.  (Dkt. No. 14 at 20.)  The Court agrees.

Though Can-Am asserts Sinclair technically is a GBDRA motor fuel refiner-supplier, a motor fuel franchise must be "between a motor fuel refiner-supplier and motor fuel retailer *under which the motor fuel retailer is supplied motor fuel* for resale to the public under a trademark[.]" Wash. Rev. Code § 19.120.010(5) (emphasis added).  Here, whatever the contractual agreement between Sinclair and Can-Am as to the use of the Sinclair Trademarks, that contractual relationship is not one under which Sinclair supplied Can-Am motor fuel.

Can-Am argues that interpreting the definitions of motor fuel refiner-supplier and motor fuel franchise as covering only contractual relationships where the refiner-supplier is the entity supplying the motor fuel is inconsistent and contrary to the legislature's directive on interpreting the GDBRA.  (Dkt. No. 23 at 27.)  But the GDBRA's legislative history supports such an interpretation.

> A separate franchise law is created to apply to agreements between motor fuel refiner-suppliers and motor fuel retailers. . . .
>
> Motor fuel refiner-suppliers are prohibited: From requiring a retailer to meet mandatory minimum sales volume requirements for fuel or other products unless the refiner-supplier proves that its price to the retailer has been sufficiently low to enable the retailer to reasonably meet the mandatory minimum; altering provisions of the franchise during its effective term without mutual consent of the retailer; interfering with any retailer's right to assistance or to be active in a trade

association; and from setting or compelling, directly or indirectly, the retail price at which the retailer sells motor fuel or other products to the public.

It is unlawful for a motor fuel refiner-supplier to discriminate in price between motor fuel retailers in the same marketing areas for purchases of motor fuel when the effect may be substantial harm to a retailer. . . .

Final Legislative Report, 49th Leg., at 190 (Wash. 1986).  *See also* Senate Journal, 49th Leg.,

Reg. Sess. 1775 (Wash.1986) ("The Legislature has devoted substantial time and effort to

examining allegations that the major oil companies are employing predatory pricing and other

unfair practices against the independent lessee-dealers to whom they supply gasoline and other

products. . . .").  This legislative history indicates the GDBRA was aimed at preventing predatory

pricing practices by refiner-suppliers that impacted independent retailers' gasoline supply and

pricing.  Where the contractual relationship between the refiner-supplier (Sinclair) and the

retailer (Can-Am) does not involve the refiner-supplier supplying gasoline, such relationship

does not involve issues related to predatory pricing by the refiner-supplier.  Such a contractual

relationship is not covered by the GDBRA.

Here, Can-Am fails to plausibly allege its contractual relationship with Sinclair included

Sinclair supplying gasoline to Can-Am.  As a result, whatever the contractual relationship

between Can-Am and Sinclair, it is not covered by the GDBRA.

Sinclair's motion to dismiss Can-Am's GDBRA claim is GRANTED.

5.  <u>Breach of contract and breach of implied duty of good faith and fair dealing</u>[6]

As already identified, Can-Am plausibly alleges the existence of some type of contractual

relationship with Sinclair regarding the Sinclair Trademarks and the processing of Sinclair

---

[6] For purposes of Sinclair's motion to dismiss, the Court treats these two claims as a breach of contract claim because they both arise out of the alleged contractual relationship between Can-Am and Sinclair.  Once discovery is complete, the Court can determine whether there are facts sufficient to support two separate claims.

credits cards at Can-Am's Licensed Location.  It also has alleged facts that could be used to support a conclusion that Sinclair wrongfully stopped processing the Sinclair credit cards, failed to remit monies, and terminated the Sinclair Trademarks.

At this stage of the litigation, however, it is unclear what the exact contours of the alleged contractual relationship between Can-Am and Sinclair.  Can-Am claims all provisions of the STSA apply to the alleged contractual relationship between Can-Am and Sinclair.  Sinclair, of course, denies any of the provision of the STSA apply.  At present, and without complete discovery, the Court is unable to rule one way or the other which provisions of the STSA apply.[7]

For purposes of the motion to dismiss, the Court concludes Can-Am plausibly alleges a breach of contract claim with the exact contours of the contractual relationship to be determined by the ultimate trier of fact.

Accordingly, Sinclair's motion to dismiss Can-Am's claims for breach of contract and breach of implied duty of good faith and fair dealing is DENIED.

6.  Inducing Breach of Contract

Regarding Can-Am's alternative claim of "inducing breach of contract," Sinclair argues Can-Am "must establish [Sinclair and Glovis] acted together with malicious intent."  (Dkt. No. 14 at 26.)  Can-Am's response, however, does not identify the elements of their claim.  (*See* Dkt. No. 23 at 30) (referencing the claim at line 16, but without any discussion as to the elements of the claim).

Can-Am's inducing breach of contract claim is unclear.  On the one hand, Can-Am appears to assert a claim based on some sort of conspiracy by stating, "Sinclair *worked in concert* to breach the Sinclair Trademark Sublicense[.]"  (Dkt. No. 1 at 37) (emphasis added).

---

[7] This includes whether the choice of law provision found in paragraph 20 of the STSA applies.

This may mean, as Sinclair argues, that malicious intent must be alleged. On the other hand, "inducing" describes conduct that seeks to influence or persuade certain action, which is akin to a claim for intentional interference with a contractual relationship—a claim that Can-Am already asserts as its seventh and eighth causes of action.

Because Can-Am fails to identify the elements of its "inducing breach of contract claim," and because this claim appears duplicative of other claims, Sinclair's motion to dismiss such claim is GRANTED.

       7.   <u>Intentional interference with contractual relations and with prospective economic advantage</u>

For all intents and purposes, Can-Am's alternative claims for intentional interference with "contractual relations" and "with prospective economic advantage" are the same. "A claim of intentional interference [with a contractual relationship] requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that cause breach or termination of the contractual relationship, and (3) resultant damage." *Elcon Const. v. Eastern Washington University*, 273 P.3d 965, 971 (Wash. 2012). Similarly,

> the tort of interference with a business or economic expectancy, which consists of five elements: (1) existence of a valid contractual relationship or business expectancy, (2) defendants had knowledge of that relationship, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) defendants interfered for an improper purpose or used improper means, and (5) resultant damage.

*Grange Ins. Ass'n v. Roberts*, 320 P.3d 77, 90 (Wash. Ct. App. 2013).

Here, the contractual relationship at issue is the STSA between Can-Am and Glovis. Sinclair had notice of this contractual relationship. Can-Am alleges Sinclair intentionally interfered with the terms of STSA to assist Can-Am in "forcing to accept assignment of the

Sinclair Trademark Sublicense to" another motor fuel distributor. (Dkt. No. 1 at 38.) The interference is alleged to have included the withholding of credit card payment processing at the Licensed Location, which Can-Am alleges was an improper mean of interfering. (*Id*.) Can-Am further alleges it suffered damage as a result.

At this stage of the litigation, Plaintiff has plausibly alleged an alternative claim for intentional interference with a contractual relationship and economic expectancy. Sinclair's motion to dismiss these claims (which in reality is only one claim) is DENIED.

**B. Glovis' Motion to Dismiss (Dkt. No. 17)**

   1. <u>PMPA Claim</u>

Like Sinclair, Glovis asserts the STSA is not subject to the PMPA because "[a]n essential condition of a PMPA franchise agreement is that the gasoline must be sold under the trademark of the refinery that supplies the fuel." (Dkt. No. 17 at 19) (italics and bold removed[8]). In response, Can-Am asserts a PMPA franchise exists because the STSA "is a contract 'between a distributor and a retailer, under which a . . . distributor [GLOVIS] . . . authorizes or permits a retailer or distributor [Can-Am] to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by' a refiner." (Dkt. No. 24 at 12) (quoting 15 U.S.C. 2801(1)(A)). And applying this language, the STSA creates a PMPA franchise because under the STSA Glovis is distributing fuel and the STSA permits use of the Sinclair Trademark. (*Id*.) But Glovis fails to quote the entirety of the applicable language contained in § 2801(1)(A).

---

[8] As pointed out by Can-Am, Glovis's memorandum cites *Aoude v. Mobil Oil Corp.*, 982 F.2d 1115, 1122 (1st Cir. 1989), in support of this statement and then uses a parenthetical identifying "emphasis added." This makes it appear as though Glovis may be quoting language from *Aoude*, when clearly it is not. The Court admonishes counsel to avoid confusion resulting from improper parentheticals; such use could be viewed as an attempt to mislead the Court.

1    To be a PMPA franchise, the contract must be "between a distributor and a retailer, under

2    which a . . . distributor [Glovis] . . . authorizes or permits a retailer . . . to use, in connection with

3    the sale, consignment, or distribution of motor fuel, a trademark which is owned or

4    controlled . . . by *a refiner which supplies motor fuel to the distributor* which authorizes or

5    permits such use."  15 U.S.C. § 2801(1)(A) (emphasis added).  Under this plain language, the

6    refiner/trademark owner (Sinclair) is required to be the supplier of the motor fuel to the

7    distributor (Glovis).  This conclusion is consistent with the PMPA's legislative history, *see supra*

8    Section III.A.2, which confirms the PMPA was enacted to prevent refiners' integrated marketing

9    practices from cutting off gasoline supply to retailers.

10    Accordingly, Glovis's motion to dismiss the PMPA claim is GRANTED.

11        2.   <u>CPA/FIPA Claim</u>

12    Glovis's does not dispute the STSA is an agreement granting Can-Am the right to engage

13    in a business of selling goods under a marketing plan and that such business is substantially

14    associated with a trademark.  (*See* Dkt. No. 17 at 26–27.)  The STSA therefore meets the first

15    two requirements of a FIPA franchise.  *See* Wash. Rev. Code. 19.100.010(6); *see also* Section

16    III.A.3. *supra*.

17    Instead, Glovis asserts Plaintiff fails to allege facts establishing the third requirement

18    necessary to create a FIPA franchise: the payment of a franchise fee to Glovis.  (Dkt. No. 17 at

19    26) ("the Complaint lacks sufficient facts demonstrating [Can-Am] was required to pay Glovis a

20    franchise fee, directly or indirectly"); *see also* Wash. Rev. Code § 19.100.010(6)(iii).  Glovis

21    further notes that the only potential franchise fee would have been the Licensed Location fee the

22    STSA required Can-Am to pay directly to Sinclair.  (*Id*. at 26–27.)  Can-Am does not challenge

23    this argument.  (*See* Dkt. No. 24 at 14–16.)  Can-Am therefore has conceded this argument and

24

for this reason alone Can-Am's CPA/FIPA claim should be dismissed. *B&L Prods., Inc. v. Newsom*, 2022 WL 3567064, at *6, (S.D. Cal. Aug. 18, 2022) ("Where a party fails to address arguments against a claim raised in a motion to dismiss, the claims are abandoned and dismissal is appropriate."); *Lunn v. City of Los Angeles*, 629 F. Supp. 3d 1007, 1014 (C.D. Cal. 2022) (same).

Rather than address the absence of a franchise fee payment to Glovis, Can-Am argues Glovis should be liable for "selling [an] unregistered franchise" despite not being a "statutory 'franchisor.'"  (*Id*. at 15.)  As the argument goes, FIPA liability for a person who offers to sell a franchise is "far broader than someone who merely 'grants' the franchise." (*Id*.)  Thus, Can-Am speculates that the statutory definition of a subfranchise "***may*** well apply to the [STSA and i]f so, GLOVIS would be a 'subfranchisor' under the FIPA.  (*Id*.) (emphasis added).  The problem with this argument, aside from its apparent speculative nature, is that Can-Am's alleged CPA/FIPA claim is based on the termination of the alleged franchise, not on its formation.  (*See* Dkt. No. 1 at 33–34) ("FIPA prohibits termination of Can-Am's DINO MART® Franchise"; "Defendants lack the 'good cause' for termination"; "Defendants failed to provide the reasonable notice and opportunity to cure"; "Defendant's termination of Can-Am's DINO MART® Franchise without notice and without reasonable opportunity to cure"; "Defendants' attempt to terminate Can-Am's DINO MART® Franchise"; "Defendants' termination . . . in violation of FIPA has caused actual damages").

Accordingly, Glovis's motion to dismiss Can-Am's CPA/FIPA claim is GRANTED.

3.  GDBRA Claim

As already identified, a GDBRA motor fuel franchise requires a contract between a motor fuel refiner-supplier and a motor fuel retailer.  Wash. Rev. Code § 19.120.010(5).  A motor fuel

1    refiner-supplier is a person or entity "engaging in the refining of crude oil into petroleum who

2    supplies motor fuel for sale[.]"  Wash. Rev. Code § 19.120.010(6).

3        Glovis argues the complaint fails to plausibly allege facts establishing Glovis refines

4    crude oil into petroleum and supplies it for sale.  (Dkt. No. 17 at 28–29.)  In response, Can-Am

5    claims Glovis is an affiliate of a refiner, but the complaint contains no facts plausibly

6    establishing Glovis is a refiner-supplier under GDBRA.

7        Moreover, even if plausible facts could be alleged establishing that Glovis is an affiliate

8    of an entity that is a motor fuel refiner-supplier, a GBDRA contract requires the motor fuel to

9    have been supplied by the refiner-supplier supplier.  Wash. Rev. Code § 19.100.010(5); *see also*

10   Section III.A.4 *supra*.  Per the STSA, fuel was supplied by an entity that was distinct from

11   Glovis.  (*See* Dkt. No. 1-1 at 3.)

12       Accordingly, the complaint does not plausibly allege a GDBRA franchise.  Glovis's

13   motion to dismiss the GDBRA claim is GRANTED.

14       4.  Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing[9]

15       The STSA identifies Can-Am and Glovis agreed that Can-Am would purchase fuel

16   through Glovis during the term of the STSA.  (Dkt. No. 1-1 at 3.)  Can-Am asserts "GLOVIS

17   stopped supplying Can-Am with fuel in violation of Section (D)-(E) of the Sinclair Trademark

18   Sublicense."  (Dkt. No. 1 at 36.)  Can-Am provides a history of alleged facts plausibly

19

20

21

22   _____

     [9] As with Sinclair's motion to dismiss, the Court treats these two claims as a breach of contract
23   claim because they both arise out of Glovis's allege breach of the STSA.  Once discovery is
     complete, the Court can determine whether there are facts sufficient to support two separate
24   claims.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS (DKT.
NOS. 14, 17) - 24

supporting this assertion.[10]  (*See Id*. at 17–18.)  Can-Am further alleges that as a result of this alleged violation, Can-Am was injured and suffered damages.  (*Id*. at 36.)

At this stage of the litigation, Can-Am has plausibly asserted a breach of contract claim. Glovis's motion to dismiss Can-Am's breach of contract/breach of implied covenant of good faith and fair dealing claim is DENIED.

## IV.    ORDER

For the reasons state herein, Defendants' motions to dismiss (Dkt. Nos 14, 17) are each GRANTED IN PART and DENIED IN PART.

1.  Can-Am's Petroleum Marketing Practices Act claims against Sinclair and Glovis are DISMISSED.

2.  Can-Am's Consumer Protection Act for Violation of Washington Franchise Investment Act against Glovis is DISMISSED.

3.  Can-Am's Washington Gasoline Dealer Bill of Rights Act claims against Sinclair and Glovis are DISMISSED.

4.  Can-Am's alternative Inducing Breach of Contract claim against Sinclair is DISMISSED.

5.  The Defendants' request to dismiss the remaining claims are DENIED.

Dated this 25th day of February, 2025.



David G. Estudillo
United States District Judge

---

[10] It is unclear if the STSA is the only contract governing the purchase of fuel between Can-Am and Glovis.  This is because Glovis's July 7, 2023 notice references a "Retailer Product Sales Agreement" which was not attached to the Complaint.  (*See* Dkt. No. 1-1 at 117.)