UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CAN-AM FUEL DISTRIBUTION LLC,

               Plaintiff,

   v.

SINCLAIR OIL LLC et al.,

               Defendants.

CASE NO. 3:24-cv-05743-DGE

ORDER ON MOTIONS FOR
PRELIMINARY INJUNCTION
(DKT. NOS. 28, 30)

Plaintiff Can-Am Fuel Distribution LLC ("Can-Am") and Defendant Sinclair Oil LLC ("Sinclair") have each filed motions for a preliminary injunction. (Dkt. Nos. 28, 30.) For the reasons discussed herein, Can-Am's motion (Dkt. No 28) is DENIED and Sinclair's motion (Dkt. No. 30) is GRANTED.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On March 31, 2015, Sinclair and Glovis America Inc. ("Glovis") executed a Sinclair Trademark License Agreement ("STLA"). (Dkt. No. 1-1 at 15.) In April 2019, Can-Am's

affiliate and predecessor, Torcroft, LLC, executed a Letter of Intent with Glovis and Sinclair whereby Torcroft committed to branding the site located at 16320 SE Cascade Park Drive, Vancouver, Washington as a Sinclair site.  (*Id*. at 76.)

On November 22, 2019, Glovis and Can-Am executed a Sinclair Trademark Sublicense Agreement ("STSA") for use of the Sinclair Trademarks at Licensed Locations.  (*Id.* at 2.)  Each Licensed Location had to be specified in a separate Licensed Location Fee Agreement "entered into by Sinclair and [Glovis.]"  (*Id*. at 3.)  Sinclair and Glovis executed a "Licensed Location Fee Agreement: 10 year Contract" for Can-Am's retail location located at 16320 SE Cascade Park, Vancouver, Washington on December 5, 2019—the same site that was subject of the Letter of Intent signed by Can-Am's predecessor, Glovis, and Sinclair.  (*Id*. at 97–98.)  This Licensed Location Agreement required Can-Am (as a Dealer) to agree in writing to be bound by all provisions of "the Trademark License Agreement relating to the use of the Sinclair Trademarks" and stipulated that Can-Am's right to market motor fuels using these trademarks was subject to the terms and condition of the STLA.  (*Id*. at 97.)

Can-Am alleges that, beginning in July 2023, Sinclair decided it wanted to distribute motor fuel in the Washington directly rather than through license and sublicense agreements like those to which Can-Am is a party.  (Dkt. No. 1 at 3.)  Can-Am further alleges that at this time Glovis decided to discontinue the distribution of motor fuel, "which accounted for a small percentage of its logistics business."  (*Id.*)  Can-Am contends that Sinclair and Glovis, "acting in concert and combination with one another," have sought to deprive Can-Am of the benefit of its bargain under the Sublicense Agreement.  (*Id.*)

Can-Am contends Glovis neither sought nor obtained Can-Am's consent to this assignment, and that beginning on July 10, 2023, Can-Am stopped receiving daily credit card

deposits and could no longer access the Sinclair Merchant Portal.  (Dkt. No. 1 at 18.)  After Glovis discontinued Can-Am's motor fuel supply, a separate fuel supplier named Fuel Break told Can-Am that Glovis' pricing under the STSA "would not be honored, that Can-Am's Sinclair Trademark Sublicense had been assigned to Fuel Break, that Can-Am needed to sign a new credit terms sheet with Fuel Break before receiving fuel, and that Can-Am can only buy fuel from Fuel Break exclusively."  (*Id.*)  Can-Am also alleges a Sinclair representative sought verification of Can-Am's Federal Employer Identification Number "as part of an effort to force Can-Am to accept G[lovis]' unauthorized assignment of the Sinclair Trademark Sublicense to Fuel Break."  (*Id.* at 19.)

Can-Am refused to do business with Fuel Break, and instead began looking for a new supplier of motor fuel and a new credit card processor.  (*Id.* at 20.)  While Can-Am was doing so, Can-Am's Vancouver station ran out of fuel and Glovis informed Can-Am that it would not receive any fuel unless it signed Fuel Break's form of agreement and acceded to Fuel Break's terms, which were less favorable than those offered under Can-Am's agreement with Glovis. (*Id.* at 21.)  Can-Am also stopped receiving monies for credit card transactions at its Vancouver station.  (*Id.* at 22–23.)  Can-Am alleges Sinclair "subcontracted or assigned to a third party its contractual obligations to Can-Am" with respect to credit card purchases as part of a wrongful attempt by Sinclair and Glovis "to withhold motor fuel and money to which Can-Am was entitled for the purpose of coercing Can-Am into agreeing to the assignment or termination of the Sinclair Trademark Sublicense."  (*Id.* at 23.)

In September 2023, Can-Am received a check for $68,183.83 in missing credit card payments from Fuel Break, at which point Can-Am alleges that Sinclair and Glovis, realizing

that Can-Am would not surrender its rights under the Trademark Sublicense voluntarily, instead "sought to create other pretextual grounds" for terminating the Sublicense.  (*Id.* at 24.)

On September 26, 2023, Sinclair's attorneys sent Can-Am a letter stating Can-Am's Vancouver station was or might be using Sinclair's trademarks and branding "without having a current contractual right or other right to do so."  (Dkt. No. 1-1 at 144.)  On October 19, 2023, Can-Am's attorneys responded by asserting Can-Am's grievances regarding delayed receipt of credit card payments and by accusing Glovis of attempting to "terminate, constructively terminate, and assign the Trademark Sublicense Agreement in violation of the contract and the Petroleum Marketing Practices Act."  (*Id.* at 148.)  Sinclair responded on October 26, 2023, denying there was any failure to deposit credit card payments and inviting Can-Am to substantiate its allegations.  (*Id.* at 151.)

On October 31, 2023, Can-Am replied to Sinclair's letter.  (*Id.* at 153–157.)  On November 18, 2023, Can-Am sent Sinclair a letter demanding Sinclair re-instate Can-Am's ability to accept Sinclair credit cards and requesting Sinclair handle the credit card payment processing "and not assign that responsibility to any third party without Can-Am's prior written consent."  (*Id.* at 174.)  In January 2024, Sinclair and Can-Am discussed the possibility of Can-Am obtaining Sinclair-branded fuel from a distributor other than Glovis.  (Dkt. Nos. 1 at 26; 1-1 at 180–183.)

On February 13, 2024[1], Sinclair sent Glovis a "Notice of Revocation and Demand for Payment" with respect to the STLA and the Licensed Location Fee Agreement.  (Dkt. No. 28-7.) The Notice informed Glovis that Can-Am's Vancouver station, and several other Sinclair branded stations in California, had failed to comply with various provisions of the STLA and that

---

[1] The letter is dated February 13, 2023 – this appears to be a scrivener's error.

1   Glovis had failed to pay the monthly license fee.  (*Id.* at 3–4.)  Sinclair stated it had given Glovis

2   "several months" to remedy these deficiencies, but that the locations referenced in the Notice had

3   "continue[d] to display the Sinclair Trademarks despite selling motor fuel that does not comply

4   with Sinclair's Quality Standards, fail[ed] to pay amounts due and owing, and/or ha[d] ongoing

5   failures to comply with credit card and operating requirements required by the License

6   Agreement."  (*Id.* at 4.)  Sinclair informed Glovis that it was revoking its grant of a license to use

7   the Sinclair trademarks at these locations effective February 16, 2024.  (*Id.*)

8          On February 25, 2024, Glovis sent Can-Am a formal "Notice of Termination of the

9   Trademark Sublicense Agreement" between Glovis and Can-Am.  (Dkt. No. 1-1 at 62–63.)  In

10  the Notice, Glovis informed Can-Am that Sinclair had revoked its grant of a license of its

11  trademarks with respect to Can-Am's Vancouver fuel station effective February 16, 2024 and

12  had ordered Glovis and Can-Am to "de-brand" the Vancouver location by March 8, 2024.  (*Id.* at

13  62.)  Glovis stated the reason for Sinclair's revocation was Can-Am's "failure to pay monthly

14  license fees and to honor Sinclair credit cards through the Dino-Pay system."  (*Id.*)  Glovis

15  informed Can-Am that under Section 2(h) of the STSA, the STSA was subject to termination if

16  Glovis lost the right to grant the use of the Sinclair trademarks.  (*Id.*)  Glovis noted that while the

17  STSA was set to expire on December 9, 2024, Glovis was giving Can-Am notice of its intent to

18  terminate the Sublicense effective immediately, "consistent with the declaration and demand

19  from Sinclair."  (*Id.*)

20         On May 20, 2024, Glovis sent Can-Am a "formal Notice of Nonrenewal of the Sinclair

21  Trademark Sublicense Agreement" between Glovis and Can-Am.  (Dkt. No. 28-8 at 2.)  Glovis

22  stated it was providing Can-Am notice that it had "made a determination in good faith and in the

23  normal course of business to withdraw from the marketing of motor fuel through retail outlets in

24

the relevant geographic market area in which the marketing premises are located." (*Id.*) Glovis stated it was therefore "declin[ing] to renew or otherwise extend the term" of the STSA, which was set to expire on December 9, 2024. (*Id.*)

On December 17, 2024, Sinclair sent Glovis a letter stating that, based on Notice of Nonrenewal sent by Glovis to Can-Am, Glovis was "no longer sublicensing the Sinclair Trademarks to the [Vancouver] Location, and any such rights expired as of December 9, 2024." (Dkt. No. 28-10 at 3.) Sinclair stated it did not consent or approve the use of any Sinclair trademarks at the Vancouver location after this date. (*Id.*) Sinclair instructed Glovis to confirm, no later than December 23, 2024, that all Sinclair trademarks had been removed from the Vancouver location and stated that if the station was not de-branded by January 6, 2025, Sinclair would seek injunctive relief against both Glovis and Can-Am. (*Id.*)

On December 20, 2024, attorneys for Glovis sent Can-Am a letter stating Sinclair did not consent to use of its trademarks at Can-Am's Vancouver after December 23, 2024. (Dkt. No. 28-4.) Glovis demanded that Can-Am, no later than January 6, 2025, "return all items bearing the Sinclair Trademarks to Sinclair or Glovis, and to effectively de-image the Washington Licensed Location of all items and signage bearing the Sinclair Trademarks." (*Id.* at 3.)

In an email dated January 7, 2025, an attorney for Can-Am asserted Can-Am's position that the STSA was not properly terminated and stated Can-Am did not have any obligation to de-brand by the deadline. (Dkt. No. 28-5 at 3.) In a response to Can-Am dated January 8, 2025, an attorney for Sinclair stated Glovis' sublicense with Can-Am had expired based on a non-renewal, and that Can-Am's only right to use Sinclair's trademarks "was through the now expired sublicense agreement with Glovis." (*Id.* at 2.) In another response to Can-Am dated January 9, 2025, an attorney for Glovis asserted Glovis' position that the notice of nonrenewal "was

unchallenged and unopposed, with termination effective December 9, 2024."  (*Id.*)

Notwithstanding this position, Glovis extended the deadline for Can-Am to "de-brand" its

Vancouver to January 13, 2025.  (*Id.*)

### B.  Procedural Background

On September 3, 2024, Can-Am filed a complaint in this Court, asserting claims against

Sinclair and Glovis for violation of both federal and state statutes, including the Petroleum

Marketing Practices Act ("PMPA"), the Washington Consumer Protection Act ("CPA") for

violation of the Washington Franchise Investment Protection Act ("FIPA"), and Washington's

Gasoline Dealer Bill of Rights ("GDBRA").  (Dkt. No. 1 at 30–35.)  Can-Am also asserted

claims against Sinclair and Glovis for breach of contract and breach of the implied duty of good

faith and fair dealing.  (*Id.* at 35–37.)  Finally, Can-Am asserted, in the alternative, claims against

Sinclair for inducing breach of contract, intentional interference with contractual relations, and

intentional interference with prospective economic advantage.  (*Id.* at 37–40.)

In October 2024, Sinclair and Glovis filed motions to dismiss Can-Am's complaint.

(Dkt. Nos. 14, 17.)  On February 25, 2025, the Court issued an order granting each motion in part

and denying each motion in part.  (Dkt. No. 48.)  The Court dismissed Can-Am's PMPA and

GDBRA claims against Sinclair and Glovis and also dismissed Can-Am's claim under the CPA

for violation of FIPA with respect to Glovis.  (*Id.*)  The Court also dismissed Can-Am's

alternative Inducing Breach of Contract claim against Sinclair.  (*Id.*)

On January 23, 2025, prior to the Court's ruling on Defendants' motions to dismiss, Can-

Am filed a motion for a preliminary injunction.  (Dkt. No. 28.)  On January 27, 2025, Sinclair

filed its own motion for a preliminary injunction.  (Dkt. No. 30.)  The same day, Sinclair also

filed an answer to Can-Am's complaint, asserting numerous counterclaims pursuant to the

1  Lanham Act and the CPA.  (Dkt. No. 29.)  On February 18, 2025, Can-Am filed an answer to

2  Sinclair's counterclaims.  (Dkt. No. 40.)

3  ## II.     LEGAL STANDARD

4      "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

5  *v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary

6  injunction must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable

7  harm in the absence of preliminary relief; (3) a balance of equities tips in favor of a preliminary

8  injunction; and (4) that an injunction is in the public interest.  *Id.* at 20; *see also Coffman v.*

9  *Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018).

10     The Ninth Circuit also articulated an alternative "sliding scale" approach pursuant to

11  which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

12  weaker showing on the merits, combined with a stronger demonstration on the balancing test,

13  might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

14  met.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

15  Under this "sliding scale" method, the movant need only raise "serious questions going to the

16  merits," but the balance of hardships must tip "sharply" in the movant's favor.  *Id.* at 1131–1132;

17  *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

18  ## III.     DISCUSSION

19  ### A.  Can-Am's Motion for Preliminary Injunction (Dkt. No. 28)

20     Can-Am seeks, pursuant to the PMPA, CPA/FIPA and the GDBRA, a preliminary

21  injunction requiring Sinclair and Glovis to preserve the "status quo" pending trial.  (Dkt. No. 28

22  at 7.)  As a preliminary matter, the Court notes it has dismissed all Can-Am's claims under the

23  PMPA and the GDBRA, and has dismissed Can-Am's CPA/FIPA claim against Glovis.  (Dkt.

24

1   No. 48.)  Accordingly, in evaluating Can-Am's motion, the Court will only consider Can-Am's

2   CPA/FIPA claim against Sinclair.[2]

3                    1.   Serious Question Going to the Merits

4         FIPA was enacted "to curb franchisor sales abuses and unfair competitive practices."

5   *Corporate Res., Inc. v. Eagle Hardware & Garden, Inc.*, 62 P.3d 544, 546 (Wash. Ct. App.

6   2003) (internal citation omitted).  FIPA "deals mainly with registration and disclosure

7   requirements," but it also contains a "franchisee bill of rights," which is intended to

8   "ameliorate[ ] the non-negotiable nature of the franchisor-franchisee relationship." *Red Lion

9   Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1091 (9th Cir. 2011) (internal citation

10  omitted).  "FIPA does not specify a remedy for a violation of the bill of rights, but a franchisee

11  may bring an action under Washington's Consumer Protection Act based on a FIPA violation."

12  *Id.*

13        Among the rights provided to franchisees by FIPA is a prohibition on the termination of a

14  franchise "prior to the expiration of its term except for good cause."  Wash. Rev. Code

15  § 19.100.180(2)(j).  "Good cause shall include, without limitation, the failure of the franchisee to

16  comply with lawful material provisions of the franchise or other agreement between the

17  franchisor and the franchisee and to cure such default after being given written notice thereof and

18  a reasonable opportunity, which in no event need be more than thirty days, to cure such default."

19  *Id.*

20        Can-Am argues it has raised serious questions going to the merits of its CPA/FIPA claim

21  because Sinclair failed to provide notice of the default or an opportunity to cure.  (Dkt. No. 28 at

22

23  _____

    [2] Neither Party sought leave to supplement their briefing as a result of the Court's February 25,
24  2025 order dismissing various claims.

29.)  Can-Am further argues Sinclair has not provided "good cause" for termination or non-renewal of the franchise.  (*Id.*)  Sinclair argues Can-Am never challenged Glovis' non-renewal of the STSA or otherwise sought to prevent the December 9, 2024 expiration of the STSA.  (Dkt. No. 33 at 8.)  Sinclair argues Can-Am did not assert any claims related to the non-renewal in its complaint, and now seeks to undo the expiration "and restore a purported status quo that does not look anything like the actual status quo."  (*Id.*)  Sinclair contends that FIPA does not prohibit the expiration of a franchise or grant a franchisor an automatic right to renewal.  (Dkt. No. 49 at 1.)  Sinclair argues that while Can-Am may be able to recover money damages for violations of FIPA, Can-Am cannot use FIPA to unwind the expiration of the STSA.  (*Id.* at 5–6.)

For purposes of FIPA, "good cause" is often defined to be "the failure of the franchisee to comply with a lawful provision of the franchise agreement after being given the opportunity to cure that failure."  *Fleetwood v. Stanley Steemer Int'l, Inc.*, 725 F.Supp.2d 1258, 1274 (E.D. Wash. July 2, 2010) (citing Wash. Rev. Code § 19.100.180(2)(j)).  In the February 25, 2024 Notice of Termination sent by Glovis to Can-Am, Glovis stated the reason for Sinclair's revocation of its grant of a license to use Sinclair's trademarks at the Vancouver location was Can-Am's failure to pay monthly license fees and to honor Sinclair credit cards through the Dino-Pay system.  (Dkt. No. 1-1 at 62.)  Glovis stated it was terminating the STSA effective immediately "consistent with the declaration and demand from Sinclair," and instructed Can-Am to de-brand its Vancouver station no later than March 8, 2024.  (*Id.*)

Even assuming ad arguendo[3] that Sinclair's stated reasons for revocation constitute good cause for purposes of FIPA, Can-Am was not given an opportunity to cure the alleged breaches

---

[3] The Court's reasoning also assumes that Sinclair granted Can-Am a "franchise" as that term is defined under FIPA.

1    of the STSA, which was terminated effective immediately.  While Glovis extended the de-

2    branding deadline and Sinclair did not seek injunctive relief until after the STSA expired in

3    December 2024, there is no question that Sinclair terminated Can-Am's right to use Sinclair's

4    trademarks in February 2024, nearly 10 months before Can-Am's right to use the trademarks

5    would have otherwise expired.  *Coast to Coast Stores (Cent. Organization), Inc. v. Gruschus*,

6    667 P.2d 619, 623 (Wash. 1983) (Under FIPA, a franchise is terminated "when the agreement

7    between the franchisee and franchisor is brought to an end, terminating the franchisee's right to

8    use the franchisor's trade name, service mark, or the like.").  Sinclair did so without giving

9    Glovis or Can-Am an opportunity to cure the breaches that gave rise to the termination, and so

10   Can-Am has likely raised a serious question going to the merits concerning whether Sinclair

11   violated FIPA by terminating Can-Am's right to use Sinclair's trademarks without providing an

12   opportunity to cure.[4]

13        However, even if Can-Am has raised a serious questions going to the merits with respect

14   to its FIPA/CPA claim, the Court cannot grant Can-Am the injunctive relief it seeks.  In seeking

15   a preliminary injunction, Can-Am defines the "status quo" it seeks to restore as the state of

16

17   _____

18   [4] The Court further assumes, for purposes of this motion, that Can-Am has raised a serious
     question going to the merits concerning Can-Am's claim under the CPA.  Whether violations of
19   FIPA constitute per se violations of the CPA is a question not addressed by the pleadings.  To
     succeed on a claim under the CPA, a plaintiff must prove: (1) an unfair or deceptive act or
20   practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in
     his or her business or property; and (5) causation.  *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d
     885, 889 (Wash. 2009).
21
     "The [Washington] Legislature has provided violations of the Franchise Investment Protection
22   Act are per se unfair trade practices under the Consumer Protection Act."  *Nelson v. Nat'l Fund
     Raising Consultants, Inc.*, 842 P.2d 473, 478 (Wash. 1992).  However, it is questionable whether
23   a FIPA violation constitutes a per se violation of the CPA for purposes of the "public interest"
     prong.  *See Velicer v. Falconhead Capital*, LLC, Case No. C19-1505JLR, 2020 WL 1182962 at
24   *10 n.10 (W.D. Wash. Mar. 11, 2020);

ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION (DKT. NOS. 28, 30) - 11

affairs that existed "before the series of termination notices" sent by Glovis at the behest of

Sinclair[5], namely:

> 1)   Can-Am's Vancouver location received and resold Top Tier fuel that was
>       not refined by Sinclair but approved by Sinclair to be sold under the Sinclair
>       Trademarks pursuant to the Sinclair Trademark Sublicense;
>
> 2)   Sinclair processed Can-Am's credit card payments and remitted payment
>       within 24 hours as required by the Sinclair Trademark Sublicense; and
>
> 3)   Can-Am was licensed to use the Sinclair Trademarks to operate a
>       SINCLAIR® service station and DINO MART® convenience store at the
>       Licensed Location and to appoint other dealers in accordance with the
>       Sinclair-approved Sinclair Trademark Sublicense.

(Dkt. No. 28 at 10.)  Can-Am argues this arrangement reflects "the last uncontested status"

which preceded the present dispute.  (*Id.*, citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d

1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before

the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending

controversy[.]'")).

     Sinclair argues the "supposed" status quo Can-Am asks the Court to order "is neither the

status quo or warranted."  (Dkt. No. 33 at 29.)  Sinclair argues that since the expiration of the

STSA, Can-Am's continued use of Sinclair's trademarks for fuel coordinated through a non-

Sinclair branded distributor violates the STLA.  (*Id.* at 30.)  Sinclair further argues that requiring

Sinclair to process credit cards "is not the status quo and has not been for more than a year" and

that requiring Sinclair to process credit cards at the Vancouver location "actually would alter the

status quo."  (*Id.*)  Sinclair contends the STLA expressly provides that Sinclair may terminate the

Glovis' authorization to process credit cards at any time, and that nothing in the STLA requires

Sinclair to continue processing credit cards for the Vancouver location.  (*Id.*)  Sinclair further

---

[5] Can-Am argues this state of affairs last prevailed prior to July 7, 2023.  (Dkt. No. 47 at 15.)

argues the STLA does not authorize Glovis' dealers to further license Sinclair's trademarks.  (*Id.* at 30–31.)

Here, even if the "status quo" in this case could be defined as Can-Am suggests, "[m]aintaining the status quo is not a talisman."  *Golden Gate Restaurant Association v. City and County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008); *see also Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (observing that the principle that a preliminary injunction should preserve the status quo is "not to be understood as . . . [a] hard and fast rule[ ], to be rigidly applied to every case regardless of its peculiar facts. The infinite variety of situations in which a court of equity may be called upon for interlocutory injunctive relief requires that the court have considerable discretion in fashioning such relief").

In this case, the status quo would arguably be the state of affairs described by Can-Am in its motion.  However, restoring that status quo would ignore a significant intervening event, namely the expiration of the STSA granting Can-Am the right to use Sinclair's trademarks at its Vancouver station on December 9, 2024.  The language of the STSA, which was executed in 2019, provides that it has a five-year term.  (Dkt. No. 30-6 at 2.)  The STSA further provides that Sinclair has no obligation to renew the Agreement, or to enter into any similar arrangement with Can-Am after the termination or expiration of the Agreement.  (*Id.* at 8.)  The STSA indisputably expired on December 9, 2024 and was not renewed, and FIPA does not create an automatic right to renew a franchise.  *See Thompson v. Atl. Richfield Co.*, 649 F. Supp. 969, 971 (W.D. Wash. 1986) (holding that FIPA "does not create an automatic right to renew a franchise . . . [i]nstead by implication it provides that a franchise is terminable at will, as long as the franchisor fairly compensates the franchisee according to the specific terms of the statute."); *Corp v. Atl. Richfield Co.*, 122 Wash. 2d 574, 580–581 (1993) ("While [FIPA] as originally worded granted

franchisees a right of renewal, this language was eliminated before the statute went into effect."). Similarly, any arrangements Can-Am may have had with Sinclair with respect to processing of credit cards or appointing other dealers on Can-Am's authority ended when the STSA expired.

As such, granting Can-Am the injunctive relief it seeks would effectively extend the term of an agreement that has expired and was not renewed. The Court finds instructive the reasoning of the Eastern District of New York in *J.P.T. Automotive v. Toyota Motor Sales*, 659 F. Supp. 2d 350 (E.D.N.Y. 2009), a case with a similar fact pattern. In that case, J.P.T. Automotive Inc. ("J.P.T."), an automobile dealer and Toyota franchisee, breached its franchise agreement with Toyota in numerous ways. *Id.* at 352. In response, Toyota notified J.P.T. of its intention to terminate the franchise agreement. *Id.* The parties agreed to extend the term of the franchise agreement. *Id.* One day after the extension expired, J.P.T. filed a complaint and a motion for a temporary restraining order ("TRO"). *Id.* The district court issued the TRO, "which, as a practical matter, revived the terminated franchise agreement, enabling [J.P.T.] to continue operating its business" while the case was pending. *Id.*

When considering J.P.T's motion for a preliminary injunction, the district court concluded that J.P.T.'s Toyota franchise "ha[d] already been terminated" and therefore its application for injunctive relief "[did] not seek to maintain the status quo but instead essentially s[ought] to reinstate [J.P.T.'s] Dealer Agreement with Toyota, on the grounds that Toyota did not have due cause to terminate the dealership." *Id.* at 363. The district court found that under these circumstances, J.P.T. was "actually requesting the issuance [of] a mandatory injunction". *Id.*

"In assessing whether issuance of an injunction is appropriate, the Court first considers the nature of the injunction being requested. A prohibitory injunction preserves the status quo while litigation is pending, and a mandatory injunction provides preliminary relief well beyond

maintaining the status quo." *Starkgraf v. White*, Case No. 3:23-cv-05593-RJB-MLP, 2024 WL 2925013 at *1 (W.D. Wash. May 10, 2024), citing *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994). Mandatory preliminary injunctions are disfavored, and the district court should deny such relief "unless the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320 (internal citation omitted). Generally, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citation omitted).

Here, the Court finds that Can-Am, much like J.P.T., is seeking a mandatory injunction that would re-instate an expired agreement. *See, e.g., Youngblood v. Wilson*, Case No. 3:07-CV-0079 PS, 2008 WL 215739, at *1 (N.D. Ind. Jan. 24, 2008) ("A preliminary injunction is designed to preserve the status quo in a case against possible changes. Youngblood, however, does not seek to maintain the status quo; he seeks to have the court disrupt the status quo." ); *Stanley*, 13 F.3d at 1320 (requiring a university to reappoint a head coach whose contract had expired constitutes a mandatory injunction); *Lyninger v. Motsinger*, Case No. 3:10–cv–00504–RCJ–RAM, 2010 WL 4258747 at *2 (D. Nev. Oct. 20, 2010) ("Plaintiff seeks reinstatement, not an injunction against being fired. A preliminary injunction is therefore inappropriate.") Granting Can-Am's motion for a preliminary injunction would have the effect of preserving the *existing* status quo, wherein Can-Am is using Sinclair's trademarks without permission to do so, rather than the state of affairs that prevailed before the present controversy.

Further, as discussed above, the facts and the law do not clearly favor Can-Am with respect to its FIPA/CPA claim, even if Can-Am has raised a serious question going to the merits.

1    Moreover, as discussed below, to the extent Can-Am alleges injury stemming from an improper

2    termination, such injury can be compensated with money damages.

3           Accordingly, this factor weighs against granting injunctive relief.

4                    2.    Irreparable Harm

5           Can-Am contends it will face irreparable harm absent injunctive relief.  Can-Am

6    concedes that any lost profits from the termination of the STSA can be quantified "to a certain

7    extent," but argues doing so is complicated "by Can-Am's loss of patronage and revenue because

8    of its inability since July 2023 to accept Sinclair credit cards."  (Dkt. No. 28 at 19.)  Can-Am

9    contends that it had to turn away a prospective sublicensee after Sinclair and Glovis cut off Can-

10   Am's access to credit card payments and motor fuel.  (*Id.*)  Can-Am argues termination of a

11   franchise and the resultant loss of goodwill can establish irreparable injury.  (*Id.* at 29.)  Can-Am

12   argues Sinclair will suffer no injury if the Court grants Can-Am injunctive relief.  (*Id.* at 19.)

13          The phrase "irreparable harm" is a term of art, which means that a party has suffered a

14   wrong which cannot be adequately compensated by remedies available at law, such as monetary

15   damages.  *See eBay Inc. v. Merc Exchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also E. Bay*

16   *Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Irreparable harm is 'harm for

17   which there is no adequate legal remedy, such as an award for damages.'"); *Los Angeles*

18   *Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)

19   (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) ("The possibility that adequate

20   compensatory or other corrective relief will be available at a later date, in the ordinary course of

21   litigation, weighs heavily against a claim of irreparable harm.").  Although it is well established

22   that monetary injuries are generally not considered irreparable, *Los Angeles Memorial Coliseum*,

23   634 F.2d at 1202, "[t]he loss of . . . an ongoing business representing many years of effort and

24

the livelihood of its . . . owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–126 (2d Cir. 1984) (per curiam)); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports an irreparable harm finding).

Here, Can-Am concedes that any losses stemming from Sinclair's improper termination of the STSA are both quantifiable and compensable with monetary damages. Can-Am also concedes the harm caused when it had to turn away potential sublicensees, while difficult to calculate, can be adequately compensated by money damages "exceed[ing] several million dollars." (Dkt. No. 28 at 28.) Moreover, as Sinclair rightly points out, losing the right to use Sinclair's trademarks will not put Can-Am out of business; Can-Am will still be able to operate a motor fuel station and a convenience store at its Vancouver location. Can-Am will be able to continue in business, without using Sinclair's trademarks, which it did for nearly 20 years under the Texaco and Shell trademarks. (Dkt. No. 28-3 at 4.)

As such, this factor also weighs against granting injunctive relief.

### 3. Balance of Equities and Public Interest

Before issuing a preliminary injunction, courts must identify the harm it may cause the defendant and weigh against the plaintiff's injury. In this case the Court has already determined Can-Am will not suffer irreparable harm absent a preliminary injunction. Therefore, its motion can be denied solely on that basis, as irreparable harm is a required element for a preliminary injunction. *See Winter*, 555 U.S. at 22. Further, even if the Court found these factors weighed in

Can-Am's favor, the Court could not justify granting an injunction restoring Can-Am's version of the status quo.

Accordingly, Can-Am's motion for a preliminary injunction (Dkt. No. 28) is DENIED.

**B.  Sinclair's Motion for Preliminary Injunction (Dkt. No. 30)**

Sinclair seeks a preliminary injunction requiring Can-Am to "de-brand, de-image, and otherwise cease its unauthorized use of all of Sinclair's trademarks in commerce."  (Dkt. No. 30 at 6.)  Sinclair argues that Can-Am continues to use Sinclair's trademarks at its Vancouver station after the expiration and non-renewal of the STSA, despite Can-Am's awareness of "its contractual and legal obligation to remove the Sinclair trademarks" following the expiration of the Agreement.  (*Id*.)  Sinclair contends Can-Am is intentionally violating trademark laws, that consumers visiting Can-Am's station are unaware that Can-Am no longer has the right to use Sinclair's trademarks, and that Can-Am is choosing to "to deceive the public into believing it is still operating a Sinclair-branded location."  (*Id.*)

1.  Likelihood of Success on the Merits

In its Answer, Sinclair raises 7 counterclaims under the Lanham Act: (1) Trademark Infringement; (2) Unfair Competition; (3) Trademark False Designation of Origin; (4) Trademark False Advertisement; (5) Trademark Counterfeiting; (6) Trademark Dilution; and (7) Injunctive Relief.  (Dkt. No. 29 at 31–39.)  Sinclair also asserts counterclaims for: (8) Common Law Trademark Infringement and Unfair Competition; and (9) Violation the Washington CPA. (*Id.* at 39–41.)

i.  Counterclaims 1, 2, 3, and 4

Sinclair contends it is likely to succeed on the merits of its trademark infringement and unfair competition claims because Can-Am's unauthorized use of Sinclair's marks is deceptive

1   and causes consumer confusion.  (Dkt. No. 30 at 14.)  "To prevail on a claim of trademark

2   infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a

3   protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to

4   cause consumer confusion.'"  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638

5   F.3d 1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc*.,

6   448 F.3d 1118, 1124 (9th Cir. 2006)); *New Flyer Industries Canada ULC v. Rugby Aviation*,

7   LLC, 405 F.Supp.3d 886, 896 (W.D. Wash. 2019) ("[t]he elements necessary to establish

8   trademark infringement and unfair competition claims are identical.") (internal citation omitted).

9          With respect to the first element, Sinclair does have a protectible interest in its

10   trademarks, which Sinclair indisputably owns and has registered with the United States Patent

11   and Trademark Office.  (Dkt. Nos. 30-2; 30-3.); *Pom Wonderful LLC v. Hubbard*, 775 F.3d

12   1118, 1124 (9th Cir. 2014) (Registration of a mark with the USPTO is "prima facie evidence of

13   the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive

14   right to use the mark in connection with the goods specified in the registration.").  Can-Am does

15   not contest Sinclair's proof of registration.  *Id.* ("When proof of registration is uncontested, the

16   ownership interest element of a trademark infringement claim is met.").

17          As for the second element, a likelihood of confusion exists "when consumers are likely to

18   assume that a product or service is associated with a source other than its actual source because

19   of similarities between the two sources' marks or marketing techniques."  *Int'l Jensen, Inc. v.*

20   *Metrosound U.S.A., Inc.*, 4 F.3d 819, 825 (9th Cir. 1993) (internal quotation marks omitted).

21          In assessing likelihood of confusion, courts in the Ninth Circuit apply the eight factor test

22   set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–349 (9th Cir.1979), *abrogated in*

23   *part on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods*., 353 F.3d 792

24

1   (9th Cir.2003).  The eight factors are: (1) strength of the mark; (2) proximity of the goods; (3)

2   similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type

3   of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent

4   in selecting the mark; and (8) likelihood of expansion of the product lines.  *Id.*

5        These factors "are flexible, neither exclusive or exhaustive, and not all factors are equal."

6   *Benefit Cosmetics LLC v. E.L.F. Cosmetics, Inc.*, Case No. 23-cv-00861-RS, 2024 WL 5135604

7   at *4 (N.D. Cal. Dec. 17, 2024).  "Given the fluidity of the test, the plaintiff need not satisfy

8   every factor, but must make a strong showing on at least some of the relevant factors to prevail."

9   *Id.* (citing *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631 (9th Cir. 2005)).

10       Here, the Court finds it unnecessary to analyze the above factors in detail; given that Can-

11  Am is continuing to use Sinclair's own trademarks, consumers will obviously assume, absent

12  notice to the contrary, that Can-Am's station is affiliated with Sinclair.  *See Burger King Corp. v.*

13  *Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a

14  strong risk of consumer confusion arises when a terminated franchisee continues to use the

15  former franchisor's trademarks."); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185,

16  1190 (6th Cir. 1997) ("[P]roof of continued, unauthorized use of an original trademark by one

17  whose license to use the trademark had been terminated is sufficient to establish 'likelihood of

18  confusion.'"); *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981) ("We perceive

19  that there is great likelihood of confusion when an infringer uses the exact trademark . . .");

20  *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011) ("Continued use

21  by former franchisee, dealer or licensee of the mark constitutes a fraud on the public, since they

22  are led to think that the continuing user is still connected with the trademark owner.").

23

24

In its response, Can-Am does not present any argument concerning whether Sinclair's counterclaims meet the necessary elements for trademark infringement and unfair competition. Can-Am instead argues Sinclair cannot establish a likelihood of success on its claims under the Lanham Act unless Sinclair can first establish the "proper termination of Can-Am's franchises." (Dkt. No. 41 at 18.)  However, as discussed above, even if Sinclair did grant Can-Am a franchise under FIPA, and even if that franchise was improperly terminated prior to the December 9, 2024 expiration date, permitting Can-Am to continue using Sinclair's trademarks after the expiration date would improperly revive an agreement the parties never renewed.

Conversely, in these circumstances, denying Sinclair's motion for a preliminary injunction would effectively *grant* Can-Am's motion, since, absent injunctive relief, Can-Am could continue to use Sinclair's trademarks until the resolution of this case, while Sinclair would have no mechanism to enforce its protected ownership interest in its trademarks.  *See Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.").

Accordingly, the Court finds Sinclair is likely to succeed on its claims for trademark infringement and unfair competition under the Lanham Act.  Sinclair is also likely to succeed on its claim for false designation of origin.  *Inhale, Inc. v. Inhale*, LLC, Case No. 6:19-cv-01780-AA, 2020 WL 6121942 at *4 (D. Or. Oct. 16, 2020) ("Although trademark infringement, false designation of origin, and unfair competition are three distinct claims, their essential elements are identical.").

"The elements of a false advertising claim under Section 43(a)(1)(B) of the Lanham Act are (1) a false statement of fact by the defendant in a commercial advertisement about its own or

another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *PetConnect*, 656 F.Supp.3d at 1166.  Sinclair's motion does not present sufficient argument with respect to this cause of action, and the Court cannot say, at this stage, that it is likely to succeed on the merits of its false advertising claim.

        ii.   Counterclaim 5

Sinclair further asserts it is likely to succeed on the merits of its trademark counterfeiting claim.  (Dkt. No. 30 at 19–20.)  For the reasons discussed above, Sinclair is likely to succeed on the merits of its trademark counterfeiting claim.  *See N. Face Apparel Corp. v. Dahan*, Case No. CV 13-04821 MMM (MANx), 2014 WL 12558010, at *11 (C.D. Cal. Oct. 6, 2014) ("A trademark counterfeiting claim requires proof of substantially the same elements as a trademark infringement or false designation of origin claim.").[6]

        2.   Irreparable Harm

---

[6] Sinclair also argues it is entitled to injunctive relief under the Washington CPA.  (Dkt. No. 30 at 24–25.)  Sinclair is likely to succeed on the merits of its counterclaim under the CPA for the same reasons it is likely to succeed on its counterclaims under the Lanham Act.  *See National Products, Inc. v. Arkon Resources, Inc.*, 294 F.Supp.3d 1042, 1049–1050 (W.D. Wash. 2018) ("This Court has stated on numerous occasions that federal claims under the Lanham Act and state claims under the WCPA are 'substantially congruous,' and "the elements necessary to establish a likelihood of confusion for . . .statutory unfair competition claims in Washington are the same as for federal trademark infringement and unfair competition.'").

1    By statute, Sinclair is entitled to a rebuttable presumption of irreparable harm on its

2    trademark claims because it has shown it will likely succeed on the merits.  *AK Futures LLC v.*

3    *Boyd Street Distro. LLC*, 35 F.4th 682, 694 (9th Cir. 2022), citing 15 U.S.C. § 1116(a).

4    Can-Am argues Sinclair, unlike Can-Am, will not face irreparable harm if the Court

5    grants Can-Am's motion for a preliminary injunction.  (Dkt. No. 41 at 26.)  Can-Am contends

6    any harm to Sinclair is self-inflicted, "resulting from its own decision to stop inspecting Can-

7    Am's Licensed Location in anticipation of filing its preliminary injunction motion."  (*Id.*)  Can-

8    Am asserts Sinclair cannot obtain preliminary injunctive relief based on self-inflicted harm

9    "resulting from its machinations to force an end to the Sublicense and obtain a more lucrative

10    deal requiring supply from its refinery in Anacortes."  (*Id.* at 30.)

11    Can-Am's conclusory arguments do not address the harm that will befall Sinclair absent

12    injunctive relief, and are insufficient to overcome the rebuttable presumption of irreparable harm

13    in Sinclair's favor.  Moreover, Sinclair argues, persuasively, that Can-Am's continued use of

14    Sinclair's marks will result in irreparable harm due to the resultant "loss of control over the

15    quality of goods and services advertised and offered" under its trademarks.  (Dkt. Nos. 30 at 20;

16    30-2); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013)

17    ("Evidence of loss of control over business reputation and damage to goodwill could constitute

18    irreparable harm."); *Las Vegas Sands Corp. v. Fan Yu Ming*, 360 F.Supp.3d 1072, 1081 (D. Nev.

19    2019) (where the evidence suggests that a defendant "is using the plaintiff's actual trademark—as

20    opposed to a similar mark—the plaintiff's loss of control over its business reputation supports a

21    finding of irreparable harm.").

22    Accordingly, this factor weighs in favor of granting injunctive relief for Sinclair.

23        3.   Balance of Equities

24

1    Sinclair argues the irreparable reputational injury it will suffer absent an injunction tips

2    the balance of equities sharply in Sinclair's favor.  (Dkt. No. 30 at 21.)  Sinclair contends Can-

3    Am cannot assert harm from an injunction preventing further use of trademarks that it

4    does not have the right to use.  (*Id.* at 22–23.)  Can-Am contends the balance of equities tips in

5    its favor because it will face irreparable harm if its alleged franchise is terminated, whereas

6    Sinclair will suffer "no cognizable harm" if the Court grants Can-Am's motion for a preliminary

7    injunction.  (Dkt. No. 28 at 29–30.)

8    For the reasons discussed above, any injuries suffered by Can-Am as a result of the

9    improper termination of its alleged franchise can be remedied by money damages, whereas there

10   is no adequate remedy at law for the injury caused by Can-Am's trademark infringement.  *See*

11   Sections III.A.2; III.B.2.  Further, as discussed above, denying Sinclair injunctive relief would

12   effectively sanction Can-Am's ongoing trademark infringement.  *Cadence Design Sys. v. Avant!*

13   *Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (A defendant who knowingly infringes "cannot

14   complain" when properly required to cease infringing activities); *Wetzel's Pretzels*, 797 F. Supp.

15   2d at 1029 (balance of equities tipped in trademark holder's favor where the trademark holder's

16   goodwill and reputation outweighed the harm that defendant, a small business, would likely face

17   if enjoined because while defendant "would suffer a loss of revenue" and "its employees would,

18   in all likelihood, lose their employment, it is [d]efendants who brought on those risks").

19   Accordingly, the Court finds the balance of equities tip in favor of granting Sinclair the

20   injunctive relief it seeks.

21              4.  Public Interest

22   Sinclair argues an injunction is in the public interest because the public is being harmed

23   by "being misled into believing they are frequenting a station associated with the Sinclair brand,

24

1    when they are not." (Dkt. No. 30 at 23.) Sinclair cites as one example of confusion a scenario in

2    which a customer of Can-Am's Vancouver station called Sinclair to complain about the station

3    under the impression that it was still operating under Sinclair's aegis. (*Id.* at 24.) Can-Am

4    argues the public interest in this case favors maintaining the status quo, as defined by Can-Am,

5    until the Court can decide Can-Am's claims on the merits. (Dkt. No. 41 at 27, 31.)

6        Here, the Court finds the public interest in protecting trademarks, along with the

7    likelihood of confusion resulting from Can-Am's ongoing, unauthorized use of Sinclair's

8    trademarks is sufficient to tip to the public interest factor in Sinclair's favor. *Brookfield*

9    *Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999) (In trademark

10   cases, preliminary injunctive relief is often appropriate "to promote the public interest in

11   protecting trademarks generally[.]"); *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters.,*

12   *Inc.*, 559 F.3d 985, 993 (9th Cir. 2009) ("The wording of the district court's injunction reflects

13   the usual public interest concern in trademark cases: avoiding confusion to consumers."); *Stark*

14   *v. Diageo Chateau & Estate Wines Co.*, 907 F.Supp.2d 1042, 1067 (N.D. Cal. 2012)

15   ("[p]reventing consumer confusion serves the public interest and there is a strong policy in favor

16   of protecting rights to trademarks"). The Court also finds there is a public interest in upholding

17   the terms of the STSA, under which Can-Am's right to use Sinclair's trademarks expired in

18   December 2024 and was not renewed. *See e.g., NAC Foundation, LLC v. Jodoin*, Case No. 2:16-

19   cv-1039-GMN-VCF, 2016 WL 4059648, at *2 (D. Nev. July 26, 2016) ("an injunction in this

20   instance protects the public's interest in the integrity and enforceability of contracts.").

21       As such, the public interest factor weighs in favor of granting Sinclair's motion for a

22   preliminary injunction. Accordingly, with all four *Winter* factors weighing in Sinclair's favor,

23   the Court GRANTS Sinclair's motion (Dkt. No. 30) for a preliminary injunction.

24

1

### C.  Issuance of a Bond

2

The parties' pleadings do not address whether Sinclair should be required to post a bond

3

in this case.  In its proposed order granting Sinclair's motion for a preliminary injunction,

4

Sinclair requests the Court require Sinclair to post a bond of $1,000.  (Dkt. No. 30-1 at 3.)

5

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive

6

relief "only if the movant gives security in an amount that the court considers proper to pay the

7

costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

8

Despite the seemingly mandatory language, "Rule 65(c) invests the district court 'with discretion

9

as to the amount of security required, *if any*.'"  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th

10

Cir. 2009), quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (italics in original).

11

"[T]he likelihood of success on the merits, as found by the district court, tips in favor of a

12

minimal bond or no bond at all."  *People of the State of Cal. ex rel. Van De Kamp v. Tahoe*

13

*Regional Planning Agency,* 766 F.2d 1319, 1326 (9th Cir. 1985).

14

Here, the Court finds a minimal bond appropriate given Sinclair's likelihood of success

15

on the merits, and will require Sinclair to post a bond of $1,000.

16

### IV.    ORDER

17

Can-Am's motion for a preliminary injunction (Dkt. No. 28) is DENIED.  Sinclair's

18

motion for a preliminary injunction (Dkt. No. 30) is GRANTED.  Accordingly, the Court hereby

19

ORDERS that:

20

    1)  Plaintiff and each of their respective officers, agents, servants, employees,

21

        attorneys, and all those persons in active concert or participation with them, are

22

        preliminarily enjoined from using Sinclair's trademarks in any manner at the

23

        location of 16320 SE Cascade Park, Vancouver, Washington 98683, or any other

24

place Plaintiff does business, including, but not limited to, continuing to identify itself on social media platforms in any way that references, or is similar to, or uses Sinclair's trademarks.

2) Plaintiff shall de-brand, de-image, and otherwise remove all of Sinclair's trademarks and, if necessary, allow Glovis's authorized vendor/installer onto Plaintiff's property to complete the de-branding process at Plaintiff's expense.

3) Plaintiff shall file with the Court and serve on Sinclair within thirty (30) days of the order granting the preliminary injunction a report in writing under oath setting forth in detail the manner and form in which Plaintiff has complied with the injunction per 15 U.S.C. § 1116(a); and

4) Sinclair shall be required to post a bond of $1,000.

This Preliminary Injunction shall remain in place until otherwise ordered.


Dated this 12th day of May, 2025.


David G. Estudillo
United States District Judge